UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

GARFIELD LAWSON,

               Plaintiff,

v.

JOHN DAVIDS et al.,

               Defendants.
_____/

Case No. 1:23-cv-776

Honorable Ray Kent

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff has been granted leave to proceed *in forma pauperis*. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 8.)

### I.     Removal from the Prisoner Mediation Program

In an order (ECF No. 9) entered on August 16, 2023, the Court referred the case to the *Pro Se* Prisoner Civil Rights Litigation Early Mediation Program and stayed the case for any purpose other than mediation. The order staying proceedings pending mediation contemplates that counsel for the defendants—typically the Michigan Department of Attorney General representing employees of the Michigan Department of Corrections (MDOC)—will enter a limited appearance for purposes of the early mediation process. Where one or more defendants is not an employee of the MDOC, however, effecting notice of the early mediation opportunity proves to be more difficult and is not always possible.

Defendants Davids, DeBoer, Mitchell, Kinney, Yuhas, Wood, Sandborn, Mahalic, Davis, Cassel, Barber, Bennett, Moore, Hawn, Oversmith, Morgan, and Nortan are, apparently, employees of the MDOC. Counsel has entered a limited appearance on their behalf. On the other hand, counsel initially entered a limited appearance on behalf of Defendants Doesberg and Perry, but subsequently requested that such appearance be terminated. A review of the docket indicates that, to date, no attorney has entered a limited appearance for Defendants Doesberg, Perry, and Morris. The Court cannot conduct a complete mediation in this case where no counsel has appeared for Defendants Doesberg, Perry, and Morris. The protocol governing the early mediation program does not contemplate partial settlements. Thus, the Court cannot proceed with mediation under the early mediation protocol. Accordingly, the Court will remove this case from mediation and lift the stay that was entered to facilitate mediation.

## II.     Preliminary Review of Plaintiff's Complaint

This matter is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that

2

capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a consent from the defendants[; h]owever, because they had not been served, they were not parties to th[e] action at the time the magistrate entered judgment.").[1]

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c));

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Davids, Morris, Yuhas, Wood, Sandborn, Davis, Cassel, Barber, Bennett, Hawn, Oversmith, Morgan, and Norton. The Court will also dismiss, for failure to state a claim, the following claims against remaining Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, Moore, and Mahalic: (1) Plaintiff's official capacity claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Moore, and Mahalic; (2) Plaintiff's personal capacity claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Moore, and Mahalic seeking injunctive relief; and (3) Plaintiff's Fourteenth Amendment procedural due process claims.

The following claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, Moore, and Mahalic remain in the case: (1) Plaintiff's official and personal capacity claims against Defendant Kinney seeking expungement of Plaintiff's disciplinary conviction; (2) Plaintiff's First Amendment retaliation claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, and Moore; (2) Plaintiff's Eighth Amendment claims against Defendants DeBoer, Moore, and

---

*Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

Mahalic; and (3) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Moore.

### A.      Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. The events about which Plaintiff complains, however, occurred during his incarceration at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan. Plaintiff sues Defendants Warden John Davids, Administrative Law Judge S. Morris, Grievance Coordinator Unknown Yuhas, Deputy Warden Unknown Sandborn, Resident Unit Managers Sabrina Davis and Brooke Oversmith, Inspectors Unknown Cassel and Unknown Barber, Sergeant Unknown Bennett, Director Timothy Moore, and Corrections Officers Hunter Doesberg, Beth DeBoer, Unknown Mitchell, Paul Perry, Unknown Kinney, Unknown Wood, Unknown Mahalic, Unknown Hawn, Unknown Morgan, and Unknown Norton. Plaintiff indicates that he is suing all Defendants in their official and personal capacities.

Plaintiff alleges that on September 17, 2018, he arrived at ICF. Plaintiff was given a job as a porter in Unit IV, which consisted of cleaning the unit, passing out food trays, and doing inmate laundry. On September 17, 2019, Plaintiff received a memo indicating that he had been approved for placement in level IV. (ECF No. 1, PageID.4.)

Plaintiff alleges that between October of 2018 and July 20, 2020, he maintained a prison job, received excellent work evaluations, and remained misconduct free. On July 3, 2020, Defendant DeBoer approached Plaintiff and asked whether prisoner Jeremy Hatchet was his nephew. Plaintiff responded that Jeremy Hatchet came from the same neighborhood as Plaintiff but that they were not related. Defendant DeBoer told Plaintiff that prisoner Hatchet was getting on her nerves and that if he was not there on Monday, she would make it worth Plaintiff's while.

Plaintiff understood that Defendant DeBoer wanted him to assault prisoner Hatchet and he declined her offer. (*Id.*)

On July 6, 2020, prisoner Hatchet ran from the shower unit and began fighting prisoner Green. Later that evening, Defendant DeBoer stopped by Plaintiff's cell and asked for details of the fight. Because of the fans in the unit, Defendant DeBoer could not hear Plaintiff and told Plaintiff that she would let him out of his cell to mop, so that he could convey the details of the fight. A bit later, Defendant DeBoer had another officer open Plaintiff's cell. Plaintiff then proceeded to the officers' lounge station, finding it strange that all the lights were out. Once in the office, Defendant DeBoer attempted to fondle Plaintiff's penis, but he stopped her, saying that she had the wrong idea. At this point, a third shift porter entered the area. Unsure if the incident had been witnessed, Plaintiff exited the room, but the porter stopped him and told him that he should be careful about Defendant DeBoer. Plaintiff then returned to the office and told Defendant DeBoer that he had not had anything to do with the fight between prisoners Hatchet and Green and Defendant DeBoer became irate that Plaintiff had "tricked" her and threatened to have Plaintiff placed in the hole for possession of a weapon. (*Id.*, PageID.5.)

On July 7, 2020, Plaintiff overheard Defendant DeBoer giving a falsified version of the events from the previous night. While on his work assignment the next day, Plaintiff was repeatedly approached by three of Defendant DeBoer's coworkers, who threatened him with the loss of his job assignment because DeBoer had said Plaintiff's work was less than satisfactory. (*Id.*, PageID.5–6.) Later that evening, Defendant Kinney told Plaintiff that he did not believe Defendant DeBoer's accusation that Plaintiff had passed store goods in front of her, and that Plaintiff should be careful because Defendants DeBoer and Perry had been trying to figure out how to set Plaintiff up with a knife. (*Id.*, PageID.6.)

On July 10, 2020, Plaintiff approached two of Defendant DeBoer's coworkers, Defendant Perry and non-party Officer Odumuga, in an attempt to ease tensions. However, later that evening, Defendant DeBoer repeatedly yelled and cursed at Plaintiff, prompting Officer Odumuga to intervene in an attempt to calm Defendant DeBoer. Plaintiff asked if he could speak to the Captain and the Inspector, but Defendant DeBoer denied the request. Defendant DeBoer then followed Plaintiff to his workstation, so Plaintiff requested to be placed in an observation cell. Defendant DeBoer denied this request as well. (*Id.*)

On July 13, 2020, non-party Officer Miginity told Plaintiff that he looked ill and Plaintiff stated that he had had a stomachache earlier, but could work. Officer Miginity recommended that Plaintiff take the day off. About fifteen minutes later, prisoner Raheem came to pick up laundry and said that Defendants Perry and DeBoer had offered him Plaintiff's work detail. (*Id.*)

On the afternoon of July 14, 2020, Defendant Perry stopped at Plaintiff's cell and Plaintiff asked if it was true that he and Defendant DeBoer had given his job to prisoner Raheem. (*Id.*, PageID.6–7.) Defendant Perry said that it was and that Defendant DeBoer no longer liked Plaintiff. Defendant Perry admitted that Plaintiff did a good job but stated that he was always going to support black and gray. (*Id.*, PageID.7.) At approximately 10:00 p.m., Plaintiff gave Defendant Wood two envelopes to put in the mailbox.

On July 15, 2020, non-party Officer Hinton was collecting breakfast trays and stopped at Plaintiff's cell. Plaintiff explained the situation to Officer Hinton and stated that he had written a complaint on Defendant DeBoer and sent copies of the complaint to his brother with instructions to forward a copy to Internal Affairs if Plaintiff was placed in segregation for possession of a weapon. (*Id.*) Officer Hinton suggested that Plaintiff should not have trusted Defendant Wood and offered to take a complaint to her boss, Resident Unit Manager Davis, on her lunch break. Later

that morning, Officer Hinton told Plaintiff that per the request of Defendants DeBoer and Perry, Plaintiff was to be moved to Unit 5 immediately. Officer Hinton told Plaintiff she believed one of the younger officers in Unit 5 would do the dirty work and plant a knife on Plaintiff. (*Id.*)

On July 16, 2020, Defendant Barber called Plaintiff to the control center to discuss a complaint, which Plaintiff assumed was the complaint he had given to Officer Hinton. However, the complaint discussed was the one that Plaintiff had given to Defendant Wood, which had been opened and read by Defendant Wood. (*Id.*, PageID.7–8.) During the interview, it became clear that Defendant Barber wanted to learn how Plaintiff had become aware of the planned "set up." (*Id.*, PageID.8.) Plaintiff told Defendant Barber that he had learned of the plan from Officer Hinton and a second shift officer on Unit 4. Plaintiff also stated that he had also learned that Defendant Doesberg was going to plant the weapon on Plaintiff. Defendant Barber told Plaintiff that he would speak to Defendants DeBoer, Perry, and Doesberg and let them know that Plaintiff was not to be bothered. Defendant Barber asked Plaintiff how he planned to proceed with his complaint against Defendant DeBoer and Plaintiff stated that if there was no further trouble, he would drop the complaint. (*Id.*)

On July 20, 2020, Plaintiff noticed Defendants Doesberg and Mitchell talking and staring at him while he was on the phone with his brother. Plaintiff believed that they were planning on setting him up and Plaintiff shared this belief with prisoners Lee, Common, and Delany as they exited the recreational yard. (*Id.*) Later that day, at around 5:00 p.m., Plaintiff yelled to Defendant Mitchell asking to shower. Defendant Mitchell did not respond, but a couple of minutes later his door was opened and Plaintiff proceeded to the shower. Plaintiff thought it was strange that only one other prisoner was showering and noticed that Defendant Doesberg had abandoned his

8

assigned wing and was headed up the stairs toward Plaintiff's cell. Plaintiff also saw Defendant Mitchell carrying a long-handled mirror up the stairs toward the cell.

The water was turned off about two minutes later and Defendants Doesberg and Bennett summoned Plaintiff to the day room, where they asked him where the only spot in the cell was that Plaintiff did not look behind when he moved from Unit 4 to Unit 5. Plaintiff responded that he had already spoken to Defendant Barber and that he knew about the plan to set him up with a weapon. Defendant Doesberg asked if Defendant Barber had told him what to expect if he f**ked with Defendant DeBoer. Plaintiff asked Defendant Bennett to contact Defendant Barber and was told that he would once Plaintiff was in administrative segregation. Defendant Bennett stated that if Plaintiff was telling the truth, he would see to it that Plaintiff was released from administrative segregation. (*Id.*, PageID.8–9.)

Plaintiff was placed in Unit 2 and was reviewed on a class I misconduct for possession of a weapon. On or about July 23, 2020, Plaintiff was interviewed by non-Defendant Hearing Investigator Demps. On July 24, 2020, Plaintiff met with Defendant Cassel and explained the entire situation. Defendant Cassel told Plaintiff that Defendant DeBoer was known to get the younger officers and younger prisoners to do her dirty work. Plaintiff told Defendant Cassel that he and Defendant Barber shared the same sentiment about Defendant DeBoer, and Defendant Cassel responded that no one seemed willing to tell on Defendant DeBoer. (*Id.*, PageID.9–10.)

On July 26, 2020, the outside temperature rose to above 90 degrees. Due to Plaintiff's ongoing hypertension, Plaintiff felt dizzy and asked Defendants Morgan, Bennett, and Mitchell if they would open the tray slot to help regulate the temperature in the cell. Plaintiff's request was denied, and he was forced to lie on the floor to try and breathe fresh air coming in the bottom of

the door. Plaintiff alleges that RN Mary Calkins noted the extreme heat and told officers to grant Plaintiff's request, but they still refused to open the tray slot. (*Id.*, PageID.10, 21.)

On July 29, 2020, Plaintiff attended a hearing on the class I misconduct ticket held by Defendant Morris. Hearing Investigator Demps was also present. After waiting for some time for either Defendant Cassel or Defendant DeBoer to make information from the investigation available, Defendant Morris proceeded without them. Plaintiff presented his version of the events, insisting that he had been set up because he refused to assault another inmate. Defendant Morris dismissed the charge against Plaintiff stating that if there was an ongoing investigation, there must be some evidence that Plaintiff' had been set up. After returning to Unit 5, Plaintiff was told he would have to stay in segregation until a bed opened up at a Level IV facility willing to accept him.

Plaintiff ultimately remained in segregation until December 14, 2020. (*Id.*, PageID.10–11.) Plaintiff claims that during this time he was subjected to daily harassment from officers. Plaintiff states that Defendant DeBoer was kicked out of Unit 4 sometime in August of 2020, and from that date until October of 2020, she would sit outside Plaintiff's cell window in an attempt to intimidate him. Plaintiff states that on three different occasions during that time, Defendant DeBoer sent officers to Plaintiff's cell to tell him that if he wanted to be released from segregation, he had better drop the complaint. Plaintiff reported this to Defendant Ferguson. (*Id.*, PageID.11.)

During the first week of August 2020, Plaintiff was seen by Detective Ray of the Michigan State Police and Defendant Barber. Plaintiff agreed to a mouth swab and to be fingerprinted. Approximately one week later, Plaintiff learned that Defendants Perry and Doesberg had been placed on administrative leave and had been charged in criminal court. Plaintiff asserts that this caused the harassment of him to intensify. (*Id.*)

On November 7, 2020, Defendant Hawn turned on 2 oversized fans in the unit at a time when five prisoners in the unit had COVID-19. Plaintiff asked Defendant Hawn to turn the fan off, stating that it was too cold and that it could be spreading the virus. (*Id.*) Defendant Hawn stated that the fan would stay on so long as Plaintiff's homeboys were yelling. (*Id.*)

On December 3, 2020, and December 10, 2020, Defendant Norton turned on two large fans posted at each end of the galleries and left them blowing on high until a coworker turned them off. The outside temperature was below 30 degrees. Plaintiff asked Defendant Norton why he kept turning the fans on when he worked on the unit and Defendant Norton stated that as long as Plaintiff's homeboys kept yelling, he was going to keep the fans on. (*Id.*, PageID.12.)

On December 3, 2020, Plaintiff filed a grievance regarding his continued placement in segregation. On December 14, 2020, Plaintiff was released to the general population to the same unit where a knife had been planted in his cell, which was a level V unit. A couple of days later, Plaintiff received a Security Classification Committee sheet which stated that the reason for Plaintiff's segregation classification was "Under Investigation-Outside Authority-Felony Susp." (*Id.*) This claim was made by the Housing Unit Team which consisted of Defendants Oversmith and Davis, and non-Defendant Maranka. (*Id.*) Plaintiff states that this was false because he was never the subject of an investigation by the Michigan State Police, and that the targets of the investigation were actually Defendants Perry and Doesberg.

Plaintiff contends that from the time he was placed in Unit 5, Defendant Mitchell and non-Defendant Corrections Officers Kim Betche and Randall spoke to the popular inmates on the unit and told them that unless they got Plaintiff "out of there, the[re] would be no passing or extra privileges." (*Id.*, PageID.12–13.) Shortly thereafter, inmate DeMir Cook-Reeves received several

tickets from non-parties Officers Betche and Randall because of his refusal to stop communicating with Plaintiff. (*Id.*, PageID.13.)

On April 25, 2021, Plaintiff was released from his cell to attend yard. Once outside, Officer Randall pulled him aside and apologized to Plaintiff, stating that they had a common enemy in inmate Martin. Plaintiff asked Randall where he had heard that, and Randall stated that it had been Martin who told the inspector about the fallout between Plaintiff and Defendant DeBoer. Randall also told Plaintiff that after talking to Defendants DeBoer and Kinney, he discovered that their problem with Plaintiff was a misunderstanding. Plaintiff told Randall that he did not have anything against Defendants DeBoer or Kinney, or inmate Martin, and that he just wanted to be left alone. (*Id.*) Officer Randall told Plaintiff that he and non-Defendant Officer Betche had worked something out with "Your Boy" inmate Ford. (*Id.*) Plaintiff stated that it was none of his business and walked away. (*Id.*)

On December 28, 2020, Plaintiff spoke to Defendant Davids about how he was being treated by officers in Unit 5 and about his inability to get a job. Defendant Davids expressed sympathy but stated that there was nothing he could do. Plaintiff stated that in that case, he should resign because sooner or later someone was going to get hurt. Defendant Davids addressed Plaintiff's complaints regarding Defendant Moore refusing to assign Plaintiff a job by stating that there was no security reason that Plaintiff could not work in the educational building and that Defendant Moore could email him with any questions. (*Id.*, PageID.13–14.)

On May 20, 2021, Plaintiff asked Defendant Moore if he had received Plaintiff's most recent kite requesting to fill a job vacancy in the library or gym. Defendant Moore stated that Plaintiff was prohibited from having a job in the programs building because of Plaintiff's 2005 escape. When Plaintiff responded that Defendant Davids had assured him there was no security

reason that Plaintiff could not work in the education building, Defendant Moore stated that the vacant jobs had just been filled. Plaintiff discovered that the prisoner who was hired as law library clerk was white and that he had previously been working as the gym porter. Plaintiff learned that this white prisoner was recently released from segregation after a guilty finding for escape in 2019. Plaintiff filed a discrimination grievance on Defendant Moore. (*Id.*, PageID.14.)

On July 1, 2021, Plaintiff was called to the control center to speak with Defendant Cassel and was informed that because non-Defendant Inspector Ferguson's February 24, 2021, PREA related finding on Defendant DeBoer was ruled unsubstantiated, it was his duty to conduct the second part of the PREA investigation. The meeting was supposed to be confidential, but by the next day, all of the Unit 5 officers knew that Plaintiff had informed non-Defendant Mr. Cusack that Defendant Kinney was the initial officer who warned him of possible retaliation by Defendant DeBoer. From then on, Defendant Kinney embarked on a quest to prove to his coworkers that he had not warned Plaintiff. Defendant Kinney and non-Defendant Corrections Officers all started to harass Plaintiff by denying him use of the telephone, J-pay, and kiosk machines. By the second week of July, officers on both shifts were harassing Plaintiff. Plaintiff filed numerous kites and filed a grievance on Defendant Kinney. (*Id.*, PageID.15.)

On July 7, 2021, Plaintiff reported the harassment to non-Defendant mental health case manager Lindsay Bronold, who confronted the officers, but they showed little to no respect for Ms. Bronold. (*Id.*)

On July 29, 2021, Defendant Moore ordered Plaintiff to submit to a shakedown after he had walked through a metal detector with two white inmates. (*Id.*) Plaintiff complied with the order and Defendant Moore roughly patted him down, taking Plaintiff's address book. When Plaintiff asked what his problem was, Defendant Moore responded "write your fucking grievance now," as

13

he pulled Plaintiff's pants down to his knees. (*Id.*, PageID.16.) Plaintiff smelled alcohol on Defendant Moore's breath and Plaintiff became frightened and asked Defendant Mahalic for help. A crowd had gathered and Defendant Moore taunted Plaintiff and challenged him to a fight. Plaintiff finally got Defendant Mahalic to give him permission to return to his unit, and Plaintiff hurried away with Defendant Moore on his heels. (*Id.*)

Upon his return to Unit 5, Plaintiff wrote to Defendants Davids and Cassel. Although Plaintiff did not receive a response, on August 4, 2021, non-Defendant Captain McDonald came to the unit on a PREA investigation that was launched by either Davids or Cassel. Within five minutes, Captain McDonald was accusing Plaintiff of provoking Defendant Moore, and threatened Plaintiff in attempt to get Plaintiff to sign off on the investigation. Shortly thereafter, Ms. Bronold, who had been watching from outside the window of the dayroom, interrupted the interview and brought it to an end. (*Id.*)

On August 8, 2021, while making his block representative rounds, Plaintiff stopped to answer a question from another inmate. Defendant Kinney walked by Plaintiff and purposely brushed his arm on Plaintiff's back. Defendant Kinney then made a full round, but subsequently came up behind Plaintiff and followed him down the stairs. Plaintiff abandoned his block representative duties and reported Defendant Kinney's conduct to Defendant Bennett. Defendant Bennett told Plaintiff that he should stay away from Defendant Kinney because he was pretty upset about Plaintiff talking to Internal Affairs. Plaintiff immediately wrote to Defendant Davids and non-Defendant MDOC Director Heidi Washington seeking a transfer out of ICF. Plaintiff did not get a reply, so he filed a grievance on August 15, 2021. (*Id.*, PageID.16–17.)

On August 27, 2021, Defendant Kinney stopped at Plaintiff's cell during his first round and told him to "suck his d**k." (*Id.*, PageID.17.) Less than five minutes later, non-Defendant

Betche told Plaintiff to come out of his cell for block representative rounds, although this was earlier in the day than Plaintiff had ever been let out to do such rounds. When Plaintiff came out of his cell, he noticed Defendant Kinney sitting at the top of the stairs by the bubble glaring at him and non-Defendants Randle and Betche in the window of the control bubble. When Plaintiff stepped off the stairs, he told Defendant Kinney that he did not have anything against him and did not want any problems. Plaintiff went on to say that brushing up against him and inviting him "to [suck] his private parts" was what an elementary school bully would do. (*Id.*) Defendant Kinney asked Plaintiff why he ratted on him, and the conversation broke down. Defendant Kinney then told Plaintiff to do his rounds and Plaintiff walked back to his cell, asking Defendant Kinney to call psych so he could go to an observation cell. Defendant Kinney fabricated a misconduct on Plaintiff for threatening behavior. (*Id.*)

On September 3, 2021, Plaintiff attended a hearing on the class I threatening behavior misconduct before Defendant Morris. Defendant Morris did not have any evidence during the hearing other than the misconduct report and Plaintiff's verbal statements. Plaintiff states that Defendant Morris fabricated the hearing report when she stated that the misconduct report and evidence had been reviewed with Plaintiff. (*Id.*, PageID.18.) On September 17, 2021, Plaintiff was transferred to a level V segregation unit at MBP despite the fact that he had only had 7 points after the guilty finding. (*Id.*)

Based on the foregoing, Plaintiff asserts that Defendants violated his First Amendment right to be free from retaliation, to access the courts, and to communicate by mail; his Eighth Amendment right to be free from cruel and unusual punishment; and his Fourteenth Amendment right to due process. Plaintiff also appears to be asserting a Fourteenth Amendment equal protection claim against Defendant Moore. Plaintiff seeks compensatory and punitive damages, as

well as injunctive relief, to include expungement of Plaintiff's disciplinary conviction for threatening behavior and transfer to a Level IV facility with restoration of all rights and privileges.

### B.      Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating

federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### 1.  Official Capacity Claims

As noted above, Plaintiff indicates that he is suing all Defendants in their official and personal capacities. Although an action against a defendant in his or her individual capacity intends to impose liability on the specified individual, an action against the same defendant in his or her official capacity intends to impose liability only on the entity that they represent. *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). A suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity: in this case, the MDOC. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). The states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the United States Court of Appeals for the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See, e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010).

Plaintiff seeks injunctive relief, as well as damages. Official capacity defendants, however, are absolutely immune from monetary damages. *See Will*, 491 U.S. at 71; *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998). The Court, therefore, will dismiss Plaintiff's damages claims against all Defendants in their official capacities.

An official capacity action seeking injunctive relief constitutes an exception to sovereign immunity. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (holding that the Eleventh Amendment immunity does not bar prospective injunctive relief against a state official). Importantly, "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

Here, Plaintiff is no longer confined at ICF. The Sixth Circuit has held that transfer to another correctional facility moots a prisoner's claims for declaratory and injunctive relief. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996); *Mowatt v. Brown*, No. 89-1955, 1990 WL 59896 (6th Cir. May 9, 1990); *Tate v. Brown*, No. 89-1944, 1990 WL 58403 (6th Cir. May 3, 1990); *Williams v. Ellington*, 936 F.2d 881 (6th Cir. 1991). Underlying this rule is the premise that such relief is appropriate only where a plaintiff can show a reasonable expectation or demonstrated probability that he is in immediate danger of sustaining direct future injury as the *result* of the challenged official conduct. *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Past exposure to an isolated incident of illegal conduct does not, by itself, sufficiently prove that the plaintiff will be subjected to the illegal conduct again. *See, e.g.*, *id.*; *Alvarez v. City of Chicago*, 649 F. Supp. 43 (N.D. Ill. 1986); *Bruscino v. Carlson*, 654 F. Supp. 609, 614, 618 (S.D. Ill. 1987), *aff'd*, 854 F.2d 162 (7th Cir. 1988); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Here, although Plaintiff is no longer confined at ICF, he seeks injunctive relief in the form of expungement of the disciplinary conviction from his institutional record, as well as a transfer to a Level IV facility. (Compl., ECF No. 1, PageID.25–26.) Plaintiff, however, does not allege facts suggesting that any of the named Defendants would be responsible for a future transfer to a Level IV facility because none of them are employed at the facility where Plaintiff is now incarcerated. Thus, any official capacity claims seeking relief in the form of a transfer will be dismissed.

With respect to Plaintiff's request for expungement of the disciplinary conviction, as discussed *infra*, Plaintiff has adequately pled First Amendment retaliation and Fourteenth Amendment substantive due process claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, and Moore based upon the issuance of false misconducts and the provision of false testimony. For purposes of Plaintiff's official capacity claim, these individuals would still be liable for prospective relief in the form of expungement of the disciplinary conviction.

Even though Plaintiff seeks relief that is characterized as prospective (expungement of the disciplinary conviction), his official capacity claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, and Moore are duplicative because, as set forth *supra*, official capacity claims are equivalent to suits brought against the governmental entity—here, the MDOC. In his complaint, Plaintiff suggests that Defendant Kinney was the individual responsible for issuing the false misconduct that led to Plaintiff's disciplinary conviction. (Compl., ECF No. 1, PageID.19.) Accordingly, the Court will allow Plaintiff's official capacity claim seeking expungement to proceed against Defendant Kinney. The Court will dismiss Plaintiff's official capacity claims

seeking the same relief against Defendants Doesberg, DeBoer, Mitchell, Perry, and Moore as redundant.[2]

### 2.  Personal Capacity Claims

#### a.  Claims Against Defendants Sandborn and Morgan

Although Plaintiff has named Sandborn and Morgan as Defendants, he makes no allegations against these individuals. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 545 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). The Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (citing *Terrance v. Northville Reg'l Psych. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would

---

[2] To the extent Plaintiff seeks injunctive relief against Defendants in their personal capacities, all claims seeking such relief, except for Plaintiff's claim against Defendant Kinney for expungement of his disciplinary conviction, will be dismissed for the same reasons set forth above.

suggest their involvement in the events leading to his injuries."). Plaintiff fails to even mention Defendants Sandborn or Morgan in the body of his complaint. His allegations, therefore, fall far short of the minimal pleading standards set forth in the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8 (requiring a "short and plain statement of the claim showing that the pleader is entitled to relief"). The Court, therefore, will dismiss Plaintiff's claims against Defendants Sandborn and Morgan.

### b.      Claims Against Defendants Davids, Cassel, and Barber

Throughout his complaint, Plaintiff faults Defendants Davids, Cassel, and Barber for not adequately acting upon Plaintiff's various complaints and grievances about their subordinates.

Government officials, however, may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell*, 436 U.S. at 691; *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee,* 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Here, Plaintiff fails to allege any facts suggesting that Defendants Davids, Cassel, and Barber encouraged or condoned the conduct of their subordinates, or authorized, approved, or knowingly acquiesced in that conduct. Plaintiff suggests only that they failed to investigate and denied his grievances, which is insufficient to impose § 1983 liability. *See Shehee*, 199 F.3d at 300. Plaintiff's conclusory allegations are insufficient to demonstrate that Defendants Davids, Cassel, and Barber were personally involved in the events described in Plaintiff's complaint.

Furthermore, to the extent Plaintiff suggests that these individuals violated his rights by failing to investigate his grievances and by denying his grievances, the Court notes that Plaintiff has no due process right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a

liberty interest in the grievance procedure. *See Olim v. Wakinekona*, 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, these Defendants did not deprive him of due process.

Moreover, these Defendants did not violate Plaintiff's First Amendment right to petition the government. The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (holding the right to petition protects only the right to address government; the government may refuse to listen or respond).

Finally, these Defendants' actions (or inactions) have not barred Plaintiff from seeking a remedy for his complaints. *See Cruz v. Beto*, 405 U.S. 319, 321 (1972). "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th Cir. 2014) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff's ability to seek redress is underscored by his *pro se* invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982). Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821–24 (1977). The exhaustion requirement only mandates

exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 578 U.S. 632, 640–44 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470–71 (6th Cir. 2001).

In light of the foregoing, the Court finds that Plaintiff has failed to state cognizable claims against Defendants Davids, Cassel, and Barber, and such claims will be dismissed.

### c.      Claims Against Defendant Morris

Plaintiff suggests that Defendant Morris violated his Fourteenth Amendment due process rights during the September 3, 2021, hearing regarding the class I misconduct ticket for threatening behavior issued to Plaintiff. (Compl., ECF No. 1, PageID.18.) Plaintiff contends that Defendant Morris fabricated the hearing report when she noted that the misconduct report and evidence had been reviewed with Plaintiff. (*Id.*)

Defendant Morris is an administrative law judge who served as a hearing officer for Plaintiff's major misconduct hearings. The duties of hearing officers are set forth at Mich. Comp. Laws § 791.251 through § 791.255. Hearing officers are required to be attorneys and are under the direction and supervision of a special hearing division in the Michigan Department of Corrections. *See* Mich. Comp. Laws § 791.251(6). Their adjudicatory functions are set out in the statute, and their decisions must be in writing and must include findings of facts and, where appropriate, the sanction imposed. *See* Mich. Comp. Laws § 791.252(k). There are provisions for rehearings, *see* Mich. Comp. Laws § 791.254, as well as for judicial review in the Michigan courts. *See* Mich. Comp. Laws § 791.255(2). Plaintiff specifically states that Defendant Morris is an administrative law judge. *See Shelly v. Johnson*, 849 F.2d 228, 230 (6th Cir. 1988). As such, she is entitled to

24

absolute judicial immunity from inmates' § 1983 suits for actions taken in his capacity as a hearing officer. *Id.*; *see also Powell v. Washington*, 720 F. App'x 222, 226 (6th Cir. 2017); *Barber v. Overton*, 496 F.3d 449, 452 (6th Cir. 2007); *Dixon v. Clem*, 492 F.3d 665, 674 (6th Cir. 2007); *cf. Pierson v. Ray*, 386 U.S. 547, 554–55 (1967) (judicial immunity applies to actions under § 1983 to recover for alleged deprivations of civil rights). Accordingly, the Court will dismiss Defendant Morris on the basis of judicial immunity.

### d.      First Amendment Claims

#### i.      Access to the Courts

Plaintiff contends that Defendant Yuhas violated his First Amendment right to access the courts by "reject[ing] at least five of Plaintiff's grievances in [an] attempt to prevent the Plaintiff from challenging the treatment of Plaintiff by Defendant Yuhas' coworkers." (Compl., ECF No. 1, PageID.25.)

It is well established that prisoners have a constitutional right of access to the courts. *Bounds*, 430 U.S. at 821 . The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25. The right of access to the courts also prohibits prison officials from erecting barriers that may impede the inmate's access to the courts. *See Knop v. Johnson*, 977 F.2d 996, 1009 (6th Cir. 1992).

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis*, 518 U.S. at 349; *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000. In other words, a plaintiff must plead and

demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996). The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (discussing that *Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 415.

Here, Plaintiff's complaint is devoid of any facts regarding an underlying cause of action or a lost remedy. Presumably, Plaintiff alleges that Defendant Yuhas rejected Plaintiff's grievances to prevent him from exhausting his administrative remedies and then filing a civil rights lawsuit against the other Defendants. Notably, however, Plaintiff was able to assert his claims by filing

the instant lawsuit. Accordingly, Plaintiff's First Amendment access to the courts claim against Defendant Yuhas will be dismissed.

*ii.*      Interference with Outgoing Mail

Plaintiff next contends that Defendant Wood violated his First Amendment rights to communicate by mail by tampering with Plaintiff's outgoing mail. (Compl., ECF No. 1, PageID.25.) According to Plaintiff, Defendant Wood confiscated and opened Plaintiff's outgoing mail "in an attempt to cover up a crime committed by Defendant Wood's coworker Defendant Beth DeBoer." (*Id.*) Plaintiff alleges that the outgoing mail in question was addressed to his brother, Andre Lawson. (*Id.*)

"Mail is one medium of free speech, and the right to send and receive mail exists under the First Amendment." *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008) (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 427 (1993)). A prisoner, however, retains only those First Amendment freedoms which are "not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections systems." *Martin v. Kelley,* 803 F.2d 236, 240 n.7 (6th Cir. 1986) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)); *see Turner v. Safley,* 482 U.S. 78 (1987).

The Sixth Circuit has held that "[t]wo or three pieces of mail opened in an arbitrary or capricious way suffice to state a claim." *Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir. 2009) (citations omitted). However, "isolated instances of interference with prisoners' mail" may not rise to the level of a constitutional violation under the First Amendment. *See Johnson v. Wilkinson*, No. 98-3866, 2000 WL 1175519 (6th Cir. Aug. 11, 2000) ("This random and isolated interference with Johnson's mail did not violate his constitutional rights." (citation omitted)); *see also Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) (holding that an "isolated incident,

27

without any evidence of improper motive or resulting interference with [the inmate's] right to counsel or to access to the courts, does not give rise to a constitutional violation" (citations omitted)); *Okoro v. Scibana*, 63 F. App'x 182, 184 (6th Cir. 2003) (stating that "Okoro was only able to provide one specific incident where he allegedly did not receive the full contents of a letter from his wife," and concluding that "[s]uch a random and isolated incident is insufficient to establish a constitutional violation" (citation omitted)); *cf. Colvin v. Caruso*, 605 F.3d 282, 293 (6th Cir. 2010) (citing *Johnson* for the holding that "isolated interference" with prisoners' rights may not rise to the level of a First Amendment violation). Recently, in *Smith v. Goostrey*, No. 23-1025, 2023 WL 5024659 (6th Cir. Aug. 4, 2023), the Sixth Circuit, citing *Colvin*, confirmed that a single isolated event of tampering with mail—like the claim Plaintiff raises here—"does not rise to the level of a constitutional violation." *Id*. at *3.

Because Plaintiff alleges only that Defendant Wood confiscated and opened Plaintiff's outgoing mail on one occasion, he fails to set forth an interference with mail claim that rises to the level of a First Amendment violation. Accordingly, Plaintiff's First Amendment interference with mail claim against Defendant Wood will be dismissed.

### *iii.*    Retaliation

Plaintiff asserts First Amendment retaliation claims against Defendants DeBoer, Perry, Doesberg, Moore, and Kinney. Plaintiff alleges that Defendants DeBoer and Perry retaliated against Plaintiff by conspiring to have him terminated from his work assignment after Plaintiff refused to assault inmate Hatchet and after Plaintiff filed a complaint against Defendant DeBoer for sexual harassment. (Compl., ECF No. 1, PageID.19.) He contends that Defendant Doesberg retaliated against him by trying to plant a knife in Plaintiff's cell after learning that Plaintiff had filed a complaint against Defendant DeBoer. (*Id.*) Next, Plaintiff contends that Defendant Moore

28

publicly humiliated him after Plaintiff filed a discrimination grievance against him by pulling Plaintiff's pants down to his knees. (*Id.*) Finally, Plaintiff alleges that Defendant Kinney retaliated against him by issuing a fabricated class I misconduct ticket for threatening behavior. (*Id.*) In his complaint, Plaintiff also suggests that Defendant Mitchell was part of Defendant Doesberg's plan to frame Plaintiff by planting a knife. The Court, therefore, construes Plaintiff's complaint to assert a First Amendment retaliation claim against Defendant Mitchell as well.

In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *See Thaddeus-X*, 175 F.3d at 394. Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff alleges that the various retaliatory acts occurred after he filed grievances and complaints. Plaintiff, therefore, has adequately alleged protected conduct for his retaliation claims. *See Smith*, 250 F.3d at 1037; *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Moreover, Plaintiff has set forth adequate facts suggesting that all of the alleged retaliatory acts were adverse and that they were taken in response to Plaintiff's grievances and complaints. Accordingly, Plaintiff's First Amendment retaliation claims against Defendants DeBoer, Perry, Doesberg, Moore, Kinney, and Mitchell may not be dismissed upon initial review.

### e.      Eighth Amendment Claims

Plaintiff next contends that Defendants DeBoer, Moore, Hawn, Norton, Morgan, Bennett, and Mitchell violated his Eighth Amendment rights in various ways.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated

under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### i. Defendants Hawn and Norton

Plaintiff contends that Defendants Hawn and Norton violated his Eighth Amendment rights on three occasions when they turned on two large fans in Plaintiff's housing unit. First, Plaintiff contends that Defendant Hawn turned on the fans on November 7, 2020, when five prisoners in the unit had COVID-19. (Compl., ECF No. 1, PageID.11.) Plaintiff asked Defendant Hawn to turn them off, but Defendant Hawn stated that they would stay on as long as Plaintiff's "homeboys" kept yelling. (*Id.*) Plaintiff alleges further that Defendant Norton turned the fans on for the same reason on December 3, 2020, and December 10, 2020. (*Id.*)

The Court is sympathetic to any discomfort Plaintiff may have experienced from having the fans on in his unit, especially given Plaintiff's allegations that it was too cold. However, exposure to conditions that amount to no more than a "temporary inconvenience[]" will not establish that "the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency." *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001). Moreover, Plaintiff alleges no facts suggesting that he suffered any injury

from exposure to the fans. Accordingly, Plaintiff's Eighth Amendment claims against Defendants Hawn and Norton will be dismissed.

> *ii.*    Defendants Morgan, Bennett, and Mitchell

Plaintiff next asserts that Defendants Morgan, Bennett, and Mitchell violated his Eighth Amendment rights by refusing to open Plaintiff's tray slot for fresh air when there was a heat alert. (Compl., ECF No. 1, PageID.21.) According to Plaintiff, he needed the fresh air for his "plethora of hypertension related illnesses." (*Id.*) Plaintiff alleges that RN Mary Calkins told officers to grant Plaintiff's request because of the extreme heat, but that they still refused. (*Id.*, PageID.10.)

Again, while the Court is sympathetic to Plaintiff's condition, the fact that Defendants Morgan, Bennett, and Mitchell refused to open his food slot on one occasion amounts to no more than a temporary inconvenience that does not rise to the level of an Eighth Amendment violation. *See Dellis*, 257 F.3d at 511. Plaintiff alleges no facts suggesting that he experienced any adverse symptoms from these Defendants' failure to open his food slot other than temporary discomfort. Accordingly, Plaintiff's Eighth Amendment claims against Defendants Morgan, Bennett, and Mitchell will be dismissed.

> *iii.*    Defendants DeBoer, Moore, and Mahalic

Next, Plaintiff contends that Defendant DeBoer violated his Eighth Amendment rights by grabbing his genitals "in a secluded area of the housing unit." (Compl., ECF No. 1, PageID.20.) He alleges further that Defendant Moore violated his Eighth Amendment rights by pulling Plaintiff's pants down to his knees, "humiliating the Plaintiff in front of a crowd that had gathered around at the educational building." (*Id.*) Finally, Plaintiff avers that Defendant Mahalic failed to stop Defendant Moore from pulling down Plaintiff's pants. (*Id.*, PageID.16.)

"Federal courts have long held that sexual abuse is sufficiently serious to violate the Eighth Amendment[;] [t]his is true whether the sexual abuse is perpetrated by other inmates or by guards." *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1095 (6th Cir. 2019) (citations omitted); *Bishop v. Hackel*, 636 F.3d 757, 761 (6th Cir. 2011) (discussing inmate abuse); *Washington v. Hively*, 695 F.3d 641, 642 (7th Cir. 2012) (discussing abuse by guards). However, the Sixth Circuit Court of Appeals has concluded that even minor, isolated incidents of sexual touching coupled with offensive sexual remarks do not rise to the level of an Eighth Amendment violation. *See, e.g.*, *Solomon v. Mich. Dep't of Corr.*, 478 F. App'x 318, 320–21 (6th Cir. 2012) (finding that two "brief" incidents of physical contact during pat-down searches, including touching and squeezing the prisoner's penis, coupled with sexual remarks, do not rise to the level of a constitutional violation); *Jackson v. Madery*, 158 F. App'x 656, 661 (6th Cir. 2005) (concluding that correctional officer's conduct in allegedly rubbing and grabbing prisoner's buttocks in degrading manner was "isolated, brief, and not severe" and so failed to meet Eighth Amendment standards); *Johnson v. Ward*, No. 99-1596, 2000 WL 659354, at *1 (6th Cir. May 11, 2000) (holding that male prisoner's claim that a male officer placed his hand on the prisoner's buttock in a sexual manner and made an offensive sexual remark did not meet the objective component of the Eighth Amendment).

In contrast, the Sixth Circuit has held that ongoing, coercive verbal harassment may rise to sexual abuse that violates the Eighth Amendment. *Rafferty*, 915 F.3d at 1095. The *Rafferty* court found an Eighth Amendment violation when a male prison official sexually harassed a female prisoner by repeatedly demanding that the prisoner expose herself and masturbate while the official watched and intimidated her into complying. *Id.* at 1096. The court noted that, in light of the coercive dynamic of the relationship between prison staff and prisoners, such demands amount to sexual abuse. *Id.*

33

Given Plaintiff's allegations concerning Defendants DeBoer and Moore, the Court concludes that Plaintiff's Eighth Amendment claims against them cannot be dismissed on initial screening. Moreover, in his complaint, Plaintiff alleges that Defendant Mahalic sat by and watched, "refusing to intervene," as Defendant Moore continued to taunt Plaintiff and pulled Plaintiff's pants down. Although Plaintiff has by no means proven deliberate indifference, the Court concludes that his Eighth Amendment claim against Defendant Mahalic also cannot be dismissed on initial review.

### f.      Fourteenth Amendment Claims

#### i.      Due Process—Job Placement

Plaintiff avers that Defendant Moore refused to hire him for any of the job vacancies available in the programs building at ICF. The Court, therefore, construes Plaintiff's complaint to assert a Fourteenth Amendment due process claim against Defendant Moore premised upon this refusal.  However, "no prisoner has a constitutional right to a particular job or to any job." *See Ivey*, 832 F.3d at 955; *see also Argue*, 80 F. App'x at 429 (discussing that prisoners have no constitutional right to rehabilitation, education, or jobs); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (holding that there is no constitutional right to prison employment). Consequently, any Fourteenth Amendment due process claim against Defendant Moore premised upon his refusal to hire Plaintiff for a job in the programs building will be dismissed.

#### ii.      Due Process—False Misconducts

Plaintiff suggests that Defendants DeBoer, Doesberg, Mitchell, Perry, and Kinney issued false misconducts to him. The Court, therefore, construes Plaintiff's complaint to assert due process claims against these Defendants premised upon the issuance of these false misconducts.

34

A prisoner's ability to challenge a prison misconduct conviction depends on whether the conviction implicated any liberty interest. A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the sanction "will inevitably affect the duration of his sentence" or the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Conner*, 515 U.S. at 484, 487. Under MDOC Policy Directive 03.03.105, ¶ B (eff. Apr. 18, 2022), a class I misconduct is a "major" misconduct and class II and III misconducts are "minor" misconducts. The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a class I misconduct. *Id*. ¶ AAAA.

Plaintiff first references a class I misconduct for possession of a weapon. However, he asserts that Defendant Morris dismissed this misconduct ticket following a hearing on July 29, 2020. Plaintiff, therefore, received due process of law with respect to this misconduct ticket. "Due process of law requires only that the person have the opportunity to convince an unbiased decision maker that he has been wrongly or falsely accused or that the evidence against him is false." *Onumonu v. Mich. Dep't of Corr.*, No. 1:21-cv-33, 2021 WL 972809, at *3 (W.D. Mich. Mar. 16, 2021). Accordingly, any procedural due process claims premised upon this misconduct will be dismissed.

Plaintiff also alleges that he was found guilty of a class I misconduct for threatening behavior. (Compl., ECF No. 1, PageID.18.) Plaintiff has attached a copy of the hearing report to his complaint. (ECF No. 1-5, PageID.53.) That report indicates that Plaintiff was sanctioned with 7 days of detention and 20 days' loss of privileges (LOP). (*Id.*)

In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before

depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Plaintiff is serving, *inter alia*, numerous indeterminate and life sentences, some imposed for crimes committed during 1997 and some imposed for crimes committed during 1999. *See* Offender Tracking Information System (OTIS) https://mdocweb.state.mi.us/otis2/otis2profile. aspx?mdocNumber=287931 (last visited Feb. 16, 2024). Plaintiff's earlier committed crimes might afford him eligibility for "disciplinary credits" under Michigan's disciplinary scheme, Mich. Comp. Laws § 800.33, and his later committed crimes might make him a "prisoner subject to disciplinary time," Mich. Comp. Laws § 800.34. Neither the disciplinary credits nor disciplinary time affect the duration of Plaintiff's sentence.

In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence. Rather, it merely affects parole eligibility, which remains discretionary with the parole board. *Id.* at 440; *see also Nali v. Ekman*, 355 F. App'x 909, 912 (6th Cir. 2009). Building on these rulings, in *Taylor v.*

*Lantagne*, 418 F. App'x 408, 412 (6th Cir. 2011), the court held that under the current iteration of Michigan's good behavior reward scheme, known as disciplinary time,[3] a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement. *See also Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at *4 (E.D. Mich. Nov. 24, 2010) (holding that "plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), *report and recommendation adopted*, 2011 WL 5491196 (E.D. Mich. Jan. 4, 2011). In short, the misconduct conviction does not impact the duration of Plaintiff's sentence. Therefore, Plaintiff does not enjoy a liberty interest in the misconduct proceedings based on the "duration" prong of *Sandin*.

The misconduct proceedings might also give rise to a liberty interest under Sandin if the proceedings resulted in a "significant and atypical deprivation." Plaintiff states that he was sentenced to 7 days' detention in segregation as a result of his class I misconduct conviction. Confinement in segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th Cir. 2008).

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin*,

---

[3] For some crimes committed after December 15, 1998, and all crimes committed after December 15, 2000, Michigan prisoners are "penalized" with "disciplinary time" under a statute that abolished the disciplinary credit system. Mich. Comp. Laws § 800.34.

515 U.S. at 484. Similarly, the Sixth Circuit has held that placement in administrative segregation for two months does not require the protections of due process. *See Joseph*, 410 F. App'x at 868 (61 days in segregation is not atypical and significant). It has also held, in specific circumstances, that confinement in segregation for a much longer period of time does not implicate a liberty interest. *See, e.g.*, *Jones*, 155 F.3d at 812–13 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). Generally, only periods of segregation lasting for several years or more have been found to be atypical and significant. *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest).

Plaintiff also contends that he received 20 days' LOP. Pursuant to MDOC Policy Directive 03.03.105, the "loss of privileges" sanction involves the loss of various privileges, such as access to the day room, exercise facilities, group meetings, "[o]ut of cell hobbycraft activities," the kitchen area, the general library (not including the law library), movies, music practice, and other "[l]eisure time activities." *See* MDOC Policy Directive 03.03.105, Attach. E. Where a stay of 20 days duration in segregation would not be considered an atypical or significant hardship, it defies logic to suggest that the lesser penalty of "loss of privileges" for that duration could be atypical or significant. Sixth Circuit authority bears that out. *See Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (holding that a fourteen-day loss-of-privileges sanction did not implicate the due-

38

process clause); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (nine-month loss of package privileges did not impose an atypical and significant hardship); *Miles v. Helinski*, No. 20-1279, 2021 WL 1238562, at *4 (6th Cir. Jan. 29, 2021) (five days' toplock and five days' loss of privileges fails to state a due process claim); *Alexander v. Vittitow*, No. 17-1075, 2017 WL 7050641, at *3 (6th Cir. Nov. 9, 2017) ("thirty days' loss of privileges—did not implicate a protected liberty interest"); *Langford, v. Koskela*, No. 16-1435, 2017 WL 6803554, at *3 (6th Cir. Jan. 24, 2017) (thirty-days' toplock and thirty-days' loss of privileges "does not amount to an 'atypical and significant hardship'").

For all of the foregoing reasons, Plaintiff has failed to state Fourteenth Amendment procedural due process claims against Defendants DeBoer, Doesberg, Mitchell, Perry, and Kinney premised upon their issuance of allegedly false misconducts. Accordingly, such claims will be dismissed.

*iii.*    Substantive Due Process—False Misconducts

Plaintiff may also be asserting Fourteenth Amendment substantive due process claims against Defendants DeBoer, Doesberg, Mitchell, Perry, and Kinney premised upon their issuance of false misconducts.

"Substantive due process 'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "Substantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, regardless of the fairness of the procedures used." *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) (quoting *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996)). "Conduct shocks the conscience if it

'violates the decencies of civilized conduct.'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).

With respect to an allegedly falsified misconduct report, the Sixth Circuit has held that framing an inmate by planting evidence may violate substantive due process where a defendant's conduct shocks the conscience and constitutes an "egregious abuse of governmental power." *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *overruled in other part by Thaddeus-X*, 175 F.3d at 378. The Sixth Circuit has also noted, in the context of evaluating a claim of qualified immunity, that "the distinction between attempting to frame an inmate for a misconduct charge by planting evidence on his person and attempting to frame an inmate by giving false testimony is one without a difference." *See Scott v. Churchill*, 377 F.3d 565, 571 (6th Cir. 2004). Here, Plaintiff explicitly alleges that Defendants Doesberg and Mitchell were "planning on setting him up" by planting a weapon in Plaintiff's cell, and that Plaintiff received a class I misconduct for possession of a weapon, which was ultimately dismissed. (Compl., ECF No. 1, PageID.8.) Plaintiff's allegations also suggest that Defendants DeBoer, Perry, and Kinney provided false testimony in attempts to frame Plaintiff. At this time, therefore, Plaintiff's Fourteenth Amendment substantive due process claims against Defendants Doesberg, Mitchell, DeBoer, Perry, and Kinney may not be dismissed on initial review.

*iv.*    Due Process—Security Classification

Plaintiff also takes issue with his security classification, claiming that Defendants Davis and Oversmith told Plaintiff that he had been placed in segregation because he was under investigation by an outside authority. (Compl., ECF No. 1, PageID.12) Plaintiff contends this reasoning was false because he was never the subject of an investigation. (*Id.*) Plaintiff, however, has no constitutional right to be incarcerated in a particular facility or to be held at a specific

security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody*, 429 U.S. at 88 n.9; *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976). The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges. *See, e.g.*, *Harris v. Truesdell*, 79 F. App'x 756, 759 (6th Cir. 2003) (holding that prisoner had no constitutional right to be held in a particular prison or security classification); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (same); *O'Quinn v. Brown*, No. 92-2183, 1993 WL 80292, at *1 (6th Cir. Mar. 22, 1993) (prisoner failed to state a due process or equal protection claim regarding his label as a "homosexual predator" because he did not have a constitutional right to a particular security level or place of confinement). Moreover, as discussed *supra*, Plaintiff's stay in segregation, which he avers amounted to 149 days, does not implicate a liberty interest and, therefore, fails to rise to the level of a Fourteenth Amendment due process violation. Accordingly, any Fourteenth Amendment due process claims against Defendants Davis and Oversmith premised upon their reasoning for Plaintiff's classification to segregation will be dismissed.

*v.*      Equal Protection

The Court has construed Plaintiff's complaint to assert a Fourteenth Amendment equal protection claim against Defendant Moore. Plaintiff alleges that Defendant Moore told Plaintiff that he was prohibited from having a job in the programs building at ICF because of Plaintiff's 2005 escape charge. Plaintiff responded that Defendant Davids had assured him that there was no security-based reason that Plaintiff could not work in the education building. Defendant Moore responded that the vacant jobs had just been filled. Plaintiff learned that a white inmate had been hired as the law library clerk and that this inmate had been recently released from segregation following a 2019 guilty finding for escape. (Compl., ECF No. 1, PageID.14.) Based on these allegations, the Court construes Plaintiff to be asserting a race-based equal protection claim.

The Equal Protection Clause prohibits discrimination by government actors which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681–82 (6th Cir. 2011); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). "A plaintiff presenting a race-based equal protection claim can either present direct evidence of discrimination, or can establish a prima facie case of discrimination under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011) (citing *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008)).

The threshold element of an equal protection claim is disparate treatment. *See Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006); *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'") (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 298 (6th Cir. 2006)). Here, Plaintiff alleges that Defendant Moore refused to hire Plaintiff, a black inmate, for a job in the programs building because of Plaintiff's 2005 escape but hired a white inmate who had been found guilty of escape for one of the vacancies. Given these allegations, the Court concludes that Plaintiff has set forth a plausible Fourteenth Amendment equal protection claim against Defendant Moore.

**Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Davids, Morris, Yuhas, Wood, Sandborn, Davis, Cassel, Barber, Bennett, Hawn, Oversmith, Morgan, and Norton will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court will also dismiss, for failure to state a claim, the following claims against remaining Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, Moore, and Mahalic: (1) Plaintiff's official capacity claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Moore, and Mahalic; (2) Plaintiff's personal capacity claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Moore, and Mahalic seeking injunctive relief; and (3) Plaintiff's Fourteenth Amendment procedural due process claims.

The following claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, Moore, and Mahalic remain in the case: (1) Plaintiff's official and personal capacity claims against Defendant Kinney seeking expungement of Plaintiff's disciplinary conviction; (2) Plaintiff's First Amendment retaliation claims against Defendants Doesberg, DeBoer, Mitchell, Perry, Kinney, and Moore; (2) Plaintiff's Eighth Amendment claims against Defendants DeBoer, Moore, and Mahalic; and (3) Plaintiff's Fourteenth Amendment equal protection claim against Defendant Moore.

An order consistent with this opinion will be entered.

Dated:   March 6, 2024                          /s/ Ray Kent
                                                 Ray Kent
                                                 United States Magistrate Judge